**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD LUNDBERG on his own behalf and on behalf of those similarly situated, | INDEX NO.: 22-cv-167 |
| Plaintiffs, | |
| - against - | **COMPLAINT** |
| FEDERAL EXPRESS CORPORATION | RULE 23 CLASS ACTION |
| Defendant. | |

Plaintiff Richard Lundberg, by and through his attorneys, Virginia & Ambinder, LLP, on behalf of all others similarly situated, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

1.      Plaintiff brings this action on behalf of himself due to violations of the New York City Human Rights Law ("NYCHRL") and on behalf of himself and other current and former employees similarly situated to remedy violations of the New York Labor Law ("NYLL"). Plaintiff seeks unpaid back pay and front pay, compensatory damages, reasonable attorneys' fees and costs, interest, and all other appropriate legal and equitable relief on his own behalf pursuant to the NYCHRL. Plaintiff also seeks on his own behalf, and on behalf of similarly situated employees, unpaid wages, statutory damages, liquidated damages, reasonable attorneys' fees and costs, interest, and all other appropriate legal and equitable relief pursuant to the NYLL.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. § 1332. The parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000.

3.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred within this District.

## PARTIES

4.     Plaintiff Richard Lundberg is and at all relevant times was a citizen of New York who worked for Defendant from approximately April 2019 through December 2020, primarily at the facility located at 621 W. 48th Street, New York, New York 10019, but also at other facilities, including but not limited to the facility on 42nd Street in Manhattan and at 51 20th Street, Brooklyn, New York 11232.

5.     Defendant Federal Express Corporation ("FedEx") is a foreign business corporation organized under the jurisdiction of Delaware with its headquarters located at 3610 Hacks Cross Road, Memphis, TN 38125 and a process server address of C T Corporation System, 28 Liberty Street, New York, New York 10005.

6.     Defendant provides courier delivery services worldwide and operates multiple facilities located in New York City.

7.     Defendant employed more than 4 employees during all relevant times.

8.     Defendant is and was an employer as defined under the NYCHRL and NYLL during all relevant times.

9.     Plaintiff was a former employee of Defendant as defined under the NYCHRL and NYLL.

## CLASS ALLEGATIONS

10.     Plaintiff's claims under the NYLL are properly maintainable as a Class Action under Rule 23 of the Federal Rules of Civil Procedure for all FedEx employees in the previous six

years who performed tasks such as sorting packages, unpacking trucks, loading and organizing trucks, delivering packages, and all other similar and related tasks, at Defendant's Manhattan facility locations, including but not limited to the facility located at 48th Street and 42nd Street. All such persons, including Plaintiff, are referred to as the "Class" or "Class Members."

11.     The Class is so numerous that joinder of all members is impracticable and the disposition of their claims as a class will benefit the parties and the Court. The size of the Class is believed to be at least 100 employees. In addition, the names of all potential members of the Class are not known.

12.     The number, names and addresses of the Class Members are readily ascertainable from the records of the Defendant. The dates of employment and payroll and time records are also determinable from Defendant's records.

13.     There are questions of law and fact common to Class Members that predominate over any questions affecting only individual members. Only the amount of individual damages sustained by each Class Member will vary.

14.     The claims of the Named Plaintiff are typical of the claims of each of the putative Class Members in that they were all subject to the same practices whereby management regularly disregarded the requirements of the NYLL.

15.     The Named Plaintiff will fairly and adequately protect the interest of Class Members and his interests are not adverse to the interests of the Class. Named Plaintiff's counsel is highly experienced in employment class actions seeking unpaid wages.

16.     A class action is superior to the other available methods for the fair and efficient adjudication of this controversy – particularly in the context of wage and hour litigation where individual Class Members lack the financial resources to vigorously prosecute separate lawsuits against FedEx. Because the losses, injuries and damages suffered by each of the individual Class

Members are relatively small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action, including but not limited to saving public resources and avoiding the risk of inconsistent and/or varying adjudications.

## FACTUAL ALLEGATIONS

17.     Named Plaintiff is a type one diabetic who depends on a Continuous Subcutaneous Insulin Infusion Pump and Continuous Glucose Monitor with implanted sensors and transmitters in his abdomen for daily survival (hereinafter referred to as Plaintiff's "medical devices"). These medical devices are active 24 hours a day and even small issues can result in a life-threatening situation.

18.     Plaintiff's medical devices have various alerts and alarms that if indicated must be immediately attended to. The abdomen transmitter needs to be changed on a regular basis, adjusted and recalibrated and Plaintiff often needs to adjust the pump rate and amount of medication based on changes in how he is feeling and his food and activity level.

19.     Plaintiff must also test his blood sugar level with a finger stick and glucose meter on a regular basis.

20.     In most instances, testing his blood sugar level takes about two minutes and making the fixes or adjustments needed to his medical devices during work, if necessary, takes anywhere from two to ten minutes on average.

21.     Plaintiff needs to carry a drink with sugar and the ability to drink this sugary drink at any time because this helps adjust his blood sugar quickly when necessary.

22.     Acting quickly is critical to ensuring Plaintiff's health and avoiding a serious and

even life-threatening emergency. As a result, Plaintiff needs to have his medical equipment and sugary drink with him at all times.

23.     Plaintiff's medical condition qualifies as a disability under the NYCHRL.

24.     Plaintiff informed FedEx of his medical condition, his medical devices, and what he needs to do for his condition at the beginning of his employment. At the beginning of his employment, Plaintiff informed Kelly Hudson, his hiring manager, and Jose Ortiz, the operations manager and his direct manager, about his medical condition, medical devices, and medical needs.

25.     Plaintiff's primary job duties including delivering packages using a vehicle provided by FedEx, sorted packaging, and loading packages onto FedEx vehicles.

26.     At times during his employment, Plaintiff was asked to do certain tasks that were not part of his regular job duties, such as fix a jam in the mechanical equipment that was especially dangerous for Plaintiff due to his medical devices and the tubes and connections on his body which Plaintiff explained to his manager. Additionally, Plaintiff requested temporary, less physically demanding tasks such as scanning on a few occasions when he was feeling weaker due as a result of his blood sugar levels being off and explained this request to management.

27.     Defendant never engaged in a cooperative dialogue with Plaintiff about accommodations.

28.     Defendant never provided Plaintiff with a written determination identifying any accommodation that has been granted or denied.

29.     Plaintiff was hired to work 5 days a week, Monday through Friday, as a part-time employee, for 20 or more hours per week.

30.     Plaintiff was hired to work at the FRBA station located on 48th street, although he would also work at other locations, including but not limited to the 42nd street location when directed to do so.

5

31.     Plaintiff was temporarily transferred in the summer of 2019 to work at Defendant's facility located in 51 20th Street, Brooklyn, New York 11232.

32.     Plaintiff was qualified for his job with FedEx and at all relevant times able to perform the essential functions and duties of his job at FedEx with or without reasonable accommodations.

33.     Plaintiff was paid an hourly rate of pay of approximately $22.50 per hour.

34.     On May 8, 2019, Plaintiff was assigned to work at the West 42nd Street location and on his return to the West 48th Street location was not feeling well and immediately walked into the break room to check his blood glucose. Almost immediately, Kelly Hudson and Jose Ortiz came into the break room to speak to him. Jose asked Plaintiff if he had already clocked out, to which Plaintiff explained that he had not as he still had to do his time sheets and wait for his printout and that he would do that immediately after he was done checking his sugar and would then clock out. Despite hearing that Plaintiff was checking his sugar and still had compensable work tasks to perform, Jose told Plaintiff that he needed to clock out. Kelly then told Plaintiff that "FedEx ain't paying you to check your sugar" and also told him that checking his sugar on FedEx time was "stealing company time." Plaintiff finished checking his sugar before the conversation had even finished and proceeded to finish his work tasks and clocked out.

35.     Plaintiff spoke to Jose and once again explained why it was so important that he check his blood sugar immediately when necessary and why it could not wait. Plaintiff also complained that Kelly's earlier statements to him were unacceptable, harassing, and medically discriminating. Jose agreed and said he would speak to Kelly.

36.     Approximately two days later, Kelly called Plaintiff into her office. Kelly stated that Jose spoke to her, that she did not mean to "hurt his feelings", but that "we both know you were just trying to run the clock and wanted to tell me off." Plaintiff explained to Kelly that he was

not trying to run the clock but that he had a medical condition that required immediate attention.

37.     Approximately two weeks later, Plaintiff was told by different colleagues that Kelly was telling employees that Plaintiff "gave her lip", had "an attitude", "liked to run the clock hanging out in the break room" and that Plaintiff "spoke to her like a white boy" and that he gave some "excuse about your diabetes." Colleagues told Plaintiff that he was "Kelly's least favorite person" and that "Kelly does not like you".

38.     In the morning of May 29, 2019, Plaintiff complained about Kelly's behavior and comments to Charles Boucher, his Senior Manager. Charles requested a written report about what had happened, which Plaintiff put together, and provided to Charles on June 3, 2019.

39.     Plaintiff received subsequent feedback from colleagues that Kelly was furious at Plaintiff for complaining to Charles. Plaintiff reported this information to Charles as well. This led to even more harassment and retaliation from Kelly going forward.

40.     After complaining to Charles, Jose's treatment of Plaintiff also began to change for the worse. Jose became complicit in retaliatory measures taken by Kelly and eventually, as Plaintiff's complaints escalated, was responsible for his own retaliatory measures against Plaintiff.

41.     Similarly, over time, as Plaintiff continued to vocalize his complaints about the unlawful treatment he and his co-workers experienced, Charles also took retaliatory measures against Plaintiff.

42.     Over the course of his employment with Defendant, Plaintiff complained about unlawful discrimination, harassment, retaliation, wage violations, and unsafe practices on numerous occasions to various managers, including Kelly, Jose, Sonnie Moore, and Charles.

43.     Plaintiff eventually reached out to complain to HR, speaking to Corey Davis in HR on August 14, 2019. Plaintiff had a subsequent meeting with Corey Davis on September 6, 2019 to discuss in detail the unlawful treatment he had experienced to date. Despite statements by

Corey Davis that Plaintiff's complaints were being investigated and looked into and countless attempts by Plaintiff to follow-up with Corey Davis, as of the end of December 2019 when Plaintiff stopped working for Defendant, HR never provided any update or solution.

44.     During his employment Plaintiff was subject to a myriad of retaliatory actions as a result of his complaints about unlawful treatment. Some examples of this retaliation include, but are not limited to, the following:

   a.   When two employees were having a personal conversation which Plaintiff was not participating in but was standing nearby, Jose interrupted them and said loudly enough so Plaintiff could clearly hear, something along the lines of "watch your conversations, we gotta be careful what we say in front of certain people." The implication was clear that Jose was referring to Plaintiff.

   b.   Kelly refused to approve Plaintiff's vacation requests. Jose told Plaintiff that "knowing Kelly, she'll probably give you a random Tuesday, Wednesday, or Thursday on purpose just because its you." Plaintiff eventually submitted his vacation requests directly to Charles who eventually had to approve Plaintiff's vacation days himself since Kelly was still not approving them.

   c.   Plaintiff had submitted a uniform request to Kelly and spent two months trying to get his uniforms. Charles eventually admitted that Kelly never put in the uniform request for him. Charles put in the request and Plaintiff received his uniform the following week.

   d.   Plaintiff was told to see Kelly for a key peg after completing his defensive driver class. After going to Kelly to request one, Kelly told Plaintiff that

they did not have any and had to order more. Suspecting Kelly was lying, Plaintiff went to Kevin, an employee who worked in the office, and asked him for a key peg. Kevin came back approximately five minutes later with a peg and a form to sign for it.

e.   On August 29, 2019, despite never doing one before, Jose told Plaintiff he was doing a check ride with him and assigned him additional deliveries. Jose directed Plaintiff exactly where to park the vehicle, which turned out to be several blocks away from the next delivery location, and the delivery turned out to be many heavy boxes and shipping cases weighing around 500 pounds. While Plaintiff was visibly struggling to push and pull the hand cart with so much weight up several blocks, Jose just walked ahead offering no help. After that delivery was made, Plaintiff proceeded to make the next delivery directed by Jose, which turned out to be four crates that had "150 lbs" written on them. Plaintiff asked if Jose could help, but Jose ignored Plaintiff's requests. Jose had Plaintiff make a total of ten stops on that trip and told him that Plaintiff should have done that in 45 minutes. By the time they returned to the station, the trip had taken approximately 3 hours and 45 minutes. This trip was designed to punish Plaintiff and set him up to fail with unrealistic expectations.

f.   During the check ride with Jose, Plaintiff again explained how physical exertion impacts his sugar levels. Jose gave Plaintiff suggestions for alternative lines of work allegedly in the interest of Plaintiff's health and said they can't change the demands of this route. These statements were the beginning of attempts to get Plaintiff to quit.

g.   On September 12, 2019, despite doing this since the start of his employment and with full awareness by management, Charles told Plaintiff that it was against policy to have a book bag at work and also that it was against policy to have anything to drink other than water on the floor. Upon Plaintiff pushing back and telling him, as he already knew, that he had to do this for medical reasons, Charles told Plaintiff then he had to bring a doctor's note. Charles also told Plaintiff his earphones, which were off and under his shirt, were against policy. Other employees also carried backpacks, drank beverages other than water on the floor, and used or had earphones on them without incident.

h.   Plaintiff put in a request for a winter uniform in mid-October. Despite uniform orders typically taking only one to two weeks for other employees, Plaintiff never received his winter unfirm and it was getting cold. Plaintiff followed up with Jose and Charles numerous times, was told they were looking into it, and nothing ever happened. Plaintiff never received his winter uniform.

45.   Plaintiff submitted three written reports during his employment to Defendant complaining about various unlawful actions. These reports are attached hereto as **Exhibit A**.

46.   Plaintiff and upon information and belief putative Class Members were not always permitted to clock in at the time they were told to report to work and were not paid for the time between when they reported to work and when they were allowed to clock in.

47.   As just one example, Jose told Plaintiff to come to work at 6:30 am for First Overnight or "FO Service".  Upon reporting to work at 6:30 am, Jose told Plaintiff not to clock in until 7:30 am. Plaintiff was not able to clock in until 7:30 am. After complaining that this was not

allowed, Plaintiff was removed from FO Service, resulting in less hours of work.

48.      Plaintiff and upon information and belief putative Class Members were often forced to go on unpaid breaks for time that they should have been paid for, such as while waiting at work for freight delivery or for other reasons.

49.      As just one example, Plaintiff and other employees were told they had to clock out because of a freight delay one day that ended up being a wait of approximately 90 minutes for which they were not paid any wages.

50.      As another example, Plaintiff was told by another employee that he was trapped in an elevator while working and Sonnie required him to put in unpaid break time for the time he was trapped in the elevator or else he would be written up. The employee told Plaintiff that he put in the break time to avoid being written up.

51.      Plaintiff and upon information and belief putative Class Members were often told to report to work and sent home after less than four hours and were not paid on those days for at least four hours of work.

52.      As just one example, Plaintiff reported to work one day and was sent home after working only about an hour and was not paid for four hours of work.

53.      Upon information and belief, Defendant's violations of the NYLL were willful.

## FIRST CAUSE OF ACTION - NYLL
### Failure to pay minimum of four hours after reporting to work

54.      Plaintiff repeats each and every allegation previously made and incorporates them fully herein.

55.      Pursuant to 12 NYCRR § 142-2.3, Defendant was required to pay Plaintiff and putative Class Members for a minimum of four hours on any day that they reported to work.

56.      Plaintiff and upon information and belief putative Class Members were not paid

for at least four hours on all days that they reported to work.

57.     Plaintiff and upon information and belief putative Class Members did not have a regularly scheduled shift that was less than 4 hours.

58.     Upon information and belief, the failure to pay Plaintiff and putative Class Members these lawful wages was willful.

59.     By the foregoing reasons, Defendant has violated the NYLL and supporting regulations and are liable to Plaintiff and putative Class Members in an amount to be determined at trial, plus liquidated damages, interest, attorneys' fees, costs, and any other relief permitted by law.

**SECOND CAUSE OF ACTION - NYLL**
**Failure to Pay Wages**

60.     Plaintiff repeats each and every allegation previously made and incorporates them fully herein.

61.     The NYLL provides the right to recover full wages and benefits owed but not received.

62.     Plaintiff and upon information and belief putative Class Members were at times forced to clock out and go on unpaid breaks for time they should have been paid for.

63.     Plaintiff and upon information and belief putative Class Members were also told to arrive at work at a certain time but not always permitted to clock-in at their scheduled start time, instead being forced to wait to clock-in until some later time as management directed.

64.     Pursuant to Labor Law § 191 and the cases interpreting same, Plaintiff and putative Class Members are entitled to be paid weekly wages "not later than seven calendar days after the end of the week in which the wages are earned."

65.     Upon information and belief, the failure to pay Plaintiff and putative Class

Members these lawful wages was willful.

66.     By the foregoing reasons, Defendant has violated the NYLL and supporting regulations and are liable to Plaintiff and putative Class Members in an amount to be determined at trial, plus liquidated damages, interest, attorneys' fees, costs, and any other relief permitted by law.

## THIRD CAUSE OF ACTION - NYCHRL
### Disability Discrimination

67.     Plaintiff repeats each and every allegation previously made and incorporates them fully herein.

68.     Plaintiff has a disability under the NYCHRL.

69.     Defendant had notice of Plaintiff's disability.

70.     Pursuant to the NYCHRL, Defendant is liable for unlawful discriminatory practices based upon the conduct of an employee where the employee exercised managerial or supervisory responsibility.

71.     Defendant discriminated against Plaintiff on the basis of his disability in violation of the NYCHRL.

72.     As a direct result of Defendant's unlawful actions, Plaintiff has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

73.     As a further result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer physical and emotional distress.

74.     The conduct of Defendant was done in conscious disregard of Plaintiff's rights.

75.     Plaintiff therefore seeks compensatory damages, lost wages and benefits, reasonable attorneys' fees, costs, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION - NYCHRL
**Retaliation**

76.     Plaintiff repeats each and every allegation previously made and incorporates them

fully herein.

77.     Plaintiff engaged in a protected activity under the NYCHRL.

78.     Plaintiff was retaliated against because he engaged in protected activity.

79.     Defendant's conduct was reasonably likely to deter a person from engaging in such

protected activity.

80.     As a direct result of Defendant's unlawful actions, Plaintiff has suffered damages

including, but not limited to, lost past and future income, compensation, and benefits.

81.     As a further result of Defendant's unlawful actions, Plaintiff has suffered and

continues to suffer physical and emotional distress.

82.     The conduct of Defendant was done in conscious disregard of Plaintiff's rights.

83.     Plaintiff therefore seeks compensatory damages, lost wages and benefits,

reasonable attorneys' fees, costs, punitive damages, interest, and any other damages permitted by

law in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION - NYCHRL
**Failure to Accommodate**

84.     Plaintiff repeats each and every allegation previously made and incorporates them

fully herein.

85.     Defendant was aware of Plaintiff's disability and medical needs.

86.     In the event Defendant is claiming that Plaintiff's medical needs required

accommodations, it failed to engage in a good faith discussion about accommodations.

87.     In the event Defendant is claiming that that Plaintiff's medical needs required

accommodations, Defendant unreasonably delayed and/or failed to provide reasonable

14

accommodations.

88.     As a direct result of Defendant's unlawful actions, Plaintiff has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

89.     As a further result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer physical and emotional distress.

90.     The conduct of Defendant was done in conscious disregard of Plaintiff's rights.

91.     Plaintiff therefore seeks compensatory damages, lost wages and benefits, reasonable attorneys' fees, costs, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION - NYCHRL**
**Hostile Work Environment**

92.     Plaintiff repeats each and every allegation previously made and incorporates them fully herein.

93.     Defendant engaged in a course of unlawful conduct which created a hostile work environment in violation of the NYCHRL.

94.     As a direct result of Defendant's unlawful actions, Plaintiff has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

95.     As a further result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer physical and emotional distress.

96.     The conduct of Defendant was done in conscious disregard of Plaintiff's rights.

97.     Plaintiff therefore seeks compensatory damages, lost wages and benefits, reasonable attorneys' fees, costs, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION - NYCHRL
### Failure to engage in a cooperative dialogue

98.     Plaintiff repeats each and every allegation previously made and incorporates them fully herein.

99.     Defendant failed to engage in a cooperative dialogue as required by the NYCHRL about accommodations for Plaintiff.

100.    As a direct result of Defendant's unlawful actions, Plaintiff has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

101.    As a further result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer physical and emotional distress.

102.    The conduct of Defendant was done in conscious disregard of Plaintiff's rights.

103.    Plaintiff therefore seeks compensatory damages, lost wages and benefits, reasonable attorneys' fees, costs, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION - NYCHRL
### Failure to provide a written determination

104.    Plaintiff repeats each and every allegation previously made and incorporates them fully herein.

105.    Defendant failed to provide a written determination with respect to any accommodations for Plaintiff that were granted or denied in violation of the NYCHRL.

106.    As a direct result of Defendant's unlawful actions, Plaintiff has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

107.    As a further result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer physical and emotional distress.

108.     The conduct of Defendant was done in conscious disregard of Plaintiff's rights.

109.     Plaintiff therefore seeks compensatory damages, lost wages and benefits, reasonable attorneys' fees, costs, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
### Constructive Discharge

110.     Plaintiff repeats each and every allegation previously made and incorporates them fully herein.

111.     Defendant changed Plaintiff's working conditions to such an extent that they effectively fired Plaintiff.

112.     Additionally, Plaintiff's working conditions were so intolerable that a reasonable person would have resigned.

113.     Plaintiff was constructively discharged from employment with Defendant.

114.     As a direct result of Defendant's unlawful actions, Plaintiff suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

115.     Plaintiff therefore seeks compensatory damages, lost wages and benefits, reasonable attorneys' fees, costs, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

### DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38, plaintiffs respectfully request a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment for himself as to claims under the NYCHRL

and for himself and all putative Class Members as to all claims under the NYLL as follows:

i. On the First Claim for Relief, payment of all monies owed for failure to pay a minimum of four hours in violation of 12 NYCRR 142-2.3, as well as liquidated damages, interest, attorneys' fees and costs, and any other relief permitted, in an amount to be determined at trial;

ii. On the Second Claim for Relief, payment of all monies owed for failure to pay wages, as well as liquidated damages, interest, attorneys' fees and costs, and any other relief permitted, in an amount to be determined at trial;

iii. On the Third Claim for Relief, payment of lost earnings in the form of back pay, front pay, benefits, or any other earnings, compensatory damages, punitive damages, interest, attorneys' fees and costs, and any other relief permitted, in an amount to be determined at trial;

iv. On the Fourth Claim for Relief, payment of lost earnings in the form of back pay, front pay, benefits, or any other earnings, compensatory damages, punitive damages, interest, attorneys' fees and costs, and any other relief permitted, in an amount to be determined at trial;

v. On the Fifth Claim for Relief, payment of lost earnings in the form of back pay, front pay, benefits, or any other earnings, compensatory damages, punitive damages, interest, attorneys' fees and costs, and any other relief permitted, in an amount to be determined at trial;

vi. On the Sixth Claim for Relief, payment of lost earnings in the form of back pay, front pay, benefits, or any other earnings, compensatory damages, punitive damages, interest, attorneys' fees and costs, and any other relief permitted, in an amount to be determined at trial;

vii. On the Seventh Claim for Relief, payment of lost earnings in the form of back pay, front pay, benefits, or any other earnings, compensatory damages, punitive damages, interest, attorneys' fees and costs, and any other relief permitted, in an amount to be determined at trial;

viii. On the Eighth Claim for Relief, payment of lost earnings in the form of back pay, front pay, benefits, or any other earnings, compensatory damages, punitive damages, interest, attorneys' fees and costs, and any other relief permitted, in an amount to be determined at trial;

ix. On the Ninth Claim for Relief, payment of lost earnings in the form of back pay, front pay, benefits, or any other earnings, compensatory damages, punitive damages, interest, attorneys' fees and costs, and any other relief permitted, in an amount to be determined at trial; and

x. On all claims, awarding such other and further relief as the court deems

just and proper.

Dated: New York, New York
       December 31, 2021

VIRGINIA & AMBINDER, LLP

By:      /s/ Kara Miller
         Kara Miller, Esq.
         VIRGINIA & AMBINDER, LLP
         40 Broad Street, Seventh Floor
         New York, New York 10004
         Tel:   (212) 943-9080
         Fax:   (212) 943-9082
         kmiller@vandallp.com

         *Attorneys for Plaintiff and putative Class*